Bruce W. Hulbert and Mary U. Hulbert v. Commissioner. Bruce W. Hulbert v. Commissioner. Charles H. Edwards v. Commissioner.
Bruce W. Hulbert & Mary U. Hulbert v. Commissioner
Docket Nos. 30861, 30862, 30863.
United States Tax Court
1953 Tax Ct. Memo LEXIS 12; 12 T.C.M. (CCH) 1443; T.C.M. (RIA) 54007; December 30, 1953
*12 1. On July 1, 1943, Charles H. Edwards and Bruce W. Hulbert each gave one-half of his partnership interest in the Century Biscuit Company to his respective wife. The wives developed recipes for successful cookies and improved existing recipes. They performed other services and consulted with their husbands about the general operation of the business. Pursuant to the partnership agreement, profits for the years 1943, 1944, 1945, and until January 26, 1946, were divided among the four partners who paid Federal income taxes on such distributive shares. Century was sold in 1946, and each reported his or her one-quarter share of the capital gain realized from the sale. Held, the wives were bona fide partners of Century for Federal tax purposes. 2. On June 26, 1946, Charles and Bruce, for themselves and their wives, executed a bill of sale transferring Century and all of its assets to the Kungsholm Baking Company pursuant to an agreement previously signed on March 26, 1946, setting a price of $525,000 plus one-half of Century's profits from January 26 to June 26, 1946, less a deduction for Federal and Indiana State taxes. The agreement provided that all profits during such period should *13 belong to Kungsholm. None of the four partners reported any income received by Century during such period. Held, title to Century did not pass until the bill of sale was executed, and profits from January 26 to June 26, 1946, were taxable income to the four partners. 3. On June 26, 1946, as part-payment of the purchase price of Century, Kungsholm gave the four partners its promissory note for $100,000. Previous withdrawals from partnership funds were credited against the balance due thereon. Kungsholm, at the time, was a large and going concern. Held, the value of the note was its face amount when received, and was includible at its face value in computing the total purchase price received from the sale of Century. 4. Charles and Bruce during the years in question deducted, on their Federal income tax returns, as ordinary and necessary business expenses, amounts paid in earning income from Century, from their former employers, and from other sources. For some of the expenses claimed they were reimbursed, and for others they were not. No receipted hotel bills or other records were available to substantiate their claims. Held, applying the rule of Cohan v. Commissioner, 39 Fed. (2d) 540 *14 (C.A. 2, 1930), a part of the amounts claimed is allowed. 5. In 1943 Mary U. Hulbert paid $3,025.79 in settlement of a claim against her deceased father and deducted such payment as a loss in that year. She had received assets having a value of more than $10,000 in 1939 as a part of her share of his estate. The nature of the assets so distributed was not shown. Held, on the facts, such payment was a return of a part of her father's estate which she took, originally subject to outstanding liabilities against it, and was not a properly deductible loss. 6. In 1946 and 1947, Bruce paid $63,000 for shares of stock in two Mexican companies on the representation that one had timber rights to a large tract in Mexico and would realize substantial profits from the sale of lumber on the American market; and, that the other would exploit a variety of mineral deposits on the same tract. He also loaned money to one of the companies in both years. Only a few carloads of lumber were ever shipped into the United States. He now claims a deduction in 1946 on the ground that the shares were worthless when purchased. Held, the record offers insufficient evidence to justify a holding that the shares *15 were worthless when purchased, or that they became so in 1946. 7. Bruce and his mother each owned a one-sixth interest in a creamery. They sold their combined interest in 1947 for $40,000. Each received an equal share of the selling price, $25,000 of which was paid in cash, and notes having a face value of $15,000 given for the balance. Held, Bruce realized taxable capital gain computed on a sales price of $20,000 for his one-sixth interest in the creamery. R. A. Littleton, Esq., 1021 Tower Building, Washington, D.C., for the petitioners. Robert E. Johnson, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion RICE, Judge: These consolidated proceedings involve deficiencies in income tax, as follows: Docket No.
Year
Deficiency
30861
1943
$ 2,069.38
30862
1944
24,246.62
1945
19,670.29
1946
68,130.14
1947
1,139.80
30863
1943
383.00
1944
23,970.14
1945
19,248.96
1946
71,368.49
1947
1,306.09
*16 The issues raised by the pleadings are: (1) were petitioner, Mary U. Hulbert, and Olyve G. Edwards bona fide partners of the Century Biscuit Company; (2) did the partners of the Century Biscuit Company realize taxable income from the partnership during the period January 26 to June 26, 1946; (3) was the face amount of the $100,000 promissory note given to the partners by the Kungsholm Baking Company, when it purchased the Century Biscuit Company, a part of the consideration received by them; (4) did petitioners, Bruce W. Hulbert and Charles H. Edwards, incur ordinary and necessary business expenses during the years in question, as follows: Bruce W.
Charles H.
Year
Hulbert
Edwards
1943
$1,517.72
$ 952.74
1944
718.85
504.44
1945
881.45
482.22
1946
2,121.59
3,615.71
1947
3,302.41 (5) did petitioner, Mary U. Hulbert, sustain a deductible loss of $3,025.79 in 1943 by payment of that amount in settlement of a claim against her deceased father's estate; (6) did petitioner, Bruce W. Hulbert, sustain a deductible loss of $64,000 in 1946 because certain Mexican stock was worthless when purchased in that year; and (7) did petitioner, Bruce W. Hulbert, *17 realize a long-term capital gain of $8,136.98 in 1947 from the sale of his part-interest in a creamery. The petitioners accepted respondent's determination of the total value of the partnership capital account in Century Biscuit Company for the purpose of computing the amount of long-term capital gain, and that concession, together with other uncontested adjustments, will be taken into consideration under a Rule 50 computation. General Findings of Fact Bruce W. Hulbert (hereinafter referred to as Bruce) and Mary U. Hulbert (hereinafter referred to as Mary) were husband and wife during the years here in question, as were Charles H. Edwards (hereinafter referred to as Charles) and Olyve G. Edwards (hereinafter referred to as Olyve). Bruce and Mary filed a joint income tax return for 1943 and individual returns for the years 1944, 1945, and 1946 with the collector of internal revenue at Indianapolis, Indiana. They filed separate returns for the year 1947 with the collector at Los Angles, California. Charles and Olyve filed separate returns for all years here in question with the collector at Indianapolis. The returns of all petitioners and Olyve were filed on the cash receipts *18 and disbursements basis. Issues 1, 2, and 3 Findings of Fact Prior to 1941, Charles was employed as a full-time sales representative of the Hinde & Dauche Paper Company of Sandusky, Ohio, and Bruce was similarly so employed by the Martin Varnish Company of Chicago. Charles sold paper cartons to the Miracle Baking Company (hereinafter referred to as Miracle), a partnership engaged in the manufacture of cookies in Chicago, Illinois. He was impressed with the volume of business done by Miracle and, in 1941, bought an interest in the partnership. Several months thereafter the firm became bankrupt. Miracle had manufactured one particular item - an icebox cookie - which Charles believed had great potential appeal and could be the basis for a successful business. He interested Bruce in entering the baking business and, together, they purchased Miracle from the baking company which had previously purchased it at a bankruptcy sale. Neither Bruce nor Charles had any previous experience in the baking business. They had been friends for a number of years and had often traveled together when working for their former employers. Their wives had been neighbors and close friends since childhood. *19 Prior to her marriage to Charles and for a time thereafter, Olyve was head of the Service Department of Commerce Clearing House in Chicago. She had supervised an average of approximately 150 other employees. Both wives were accomplished cooks. Charles and Bruce wished to improve Miracle's Icebox Cookies, particularly tastewise, and toward that end enlisted the help of their wives in making experiments in their own kitchens. A former employee of Miracle told Charles and Bruce that another cookie manufacturer had successfully developed a cookie with scrap "Baby Ruth" Candy Bars. The two men were favorably impressed with the idea, particularly in view of the war-time rationing of sugar. They decided that they would attempt to develop a similar cookie by using the most comparable candy bar, the "O'Henry", manufactured by the Williamson Candy Company of Chicago (hereinafter referred to as Williamson). Mary introduced Bruce to one A. L. Williamson of the candy company, whose family she had known for a number of years. As a result of discussions between Bruce and Williamson, Miracle contracted for the purchase of Williamson's scrap O'Henry Candy Bars. Olyve and Mary began a series *20 of experiments at home in an attempt to develop a suitable formula for use in manufacturing the proposed O'Henry Cookie from the candy bar. The particularly difficult problem in developing a cookie from the candy bar was the amount of grease contained in the nuts and chocolate in the candy. After several unsuccessful attempts at chilling, or heating the mixture, they discovered that, by grinding the bars and combining the mixture with the proper amount of flour, a satisfactory batter could be developed. This recipe was taken to the plant where necessary changes were made to meet the requirements of a commercially sold food product. The recipes developed by Olyve and Mary at home were a preliminary step in arriving at a formula for use in the manufacture of cookies for the commercial market. Adjustments had to be made at the plant to meet the needs of packaging, shipping, and extended storage on grocery shelves. Charles and Bruce discovered that Miracle's ovens were unsatisfactory for baking the O'Henry Cookie. Subsequently, Charles learned that the Century Biscuit Company in Indianapolis (hereinafter referred to as Century) had suitable ovens and that the firm, a corporation, was *21 for sale. On July 1, 1942, Charles and Bruce signed an agreement with Century's principal stockholder setting a purchase price of $47,100 for the 1,185 outstanding shares of stock. In order to secure the necessary bank loans to complete the purchase, Charles and Bruce were required to make a capital contribution of $15,000. Charles approached one Martin Meeter of Lansing, Illinois, whom he had known for about 10 years. A meeting was arranged in Chicago at a country club. Charles, Bruce, and Meeter played golf and were later joined by their wives for dinner. The loan was discussed at that time, but was not forthcoming until several weeks later. Meeter was familiar with the fact that Mary had inherited a part of her father's estate in 1939, and that the assets which she received had a value of more than $10,000. He knew also that Olyve had inherited a trust of approximately $30,000 from her father on which she received the interest. The corpus did not pass to her until about 1953. Only Charles and Bruce owned Century's stock. The two families moved to Indianapolis in 1942. The experienced foreman who had previously worked in the Century plant was retained. Century had previously manufactured *22 more than 100 various types of cookies. Charles and Bruce discontinued most of these items on the advice of their wives and concentrated their efforts on the production of the Miracle Icebox Cookie, the O'Henry, and a new cookie known as the Chocolate Ripple, the recipe for which was developed by Olyve and Mary. The two wives visited the Century plant from time to time to test the various products. Both, however, had two small children for whom they cared. Charles and Bruce brought cookies home for their wives to taste, and matters concerning the general conduct of the Century business were discussed with the wives at home. It was necessary to operate Century as a corporation until certain outstanding liabilities were paid. In the summer of 1943, however, the corporation was dissolved and a partnership consisting of Charles and Bruce was formed. Each had a capital account of $20,785.38. On July 1, 1943, articles of co-partnership were signed by Charles, Bruce, Olyve, and Mary. The total capital account of the partners remained at $41,570.76. Each partner's share was one-fourth of this amount, or $10,392.69. Charles and Bruce credited one-half of their respective interests in the *23 earlier partnership to Olyve's and Mary's capital accounts and filed Federal gift tax returns thereon. According to the terms of the agreement, each partner was to devote "such time as he or she, in his or her own judgment shall deem necessary or advisable in the proper conduct of the business." Each was to share equally in the profits. The agreement generally treated the four partners alike. The wives had drawing accounts of $200 per month. Olyve used such withdrawals as she made for any purpose she wished. In addition to such drawing accounts, Federal income tax payments on the distributable share of each wife were made from partnership funds. The wives maintained no regular office hours, and the day-to-day operation of the business was in the hands of Charles and Bruce. Olyve and Mary considered their principal service to be the maintenance of quality standards through the tasting of cookies. During the years in question, Century sold a large volume of its production to the Army which sent its own inspectors and tasters to the plant to insure that its required standards were maintained. Ration biscuits and other items sold to the Army were manufactured from formulas given by *24 it to Century. At the time Olyve and Mary were made partners, both Charles and Bruce had been classified 1-A under the war-time draft law. Bruce had broken his back in 1928 and had developed ulcers in 1939. Charles had a physical impairment as a result of college football. Both were subsequently classified 4-F in 1944. Partnership returns were filed for all years on a fiscal-year basis which began on July 1 and ended on June 30; but for the fiscal year ended June 30, 1946, only income received up to January 26, 1946, was reported. In the Fall of 1945, Charles and Bruce began negotiations with the Kungsholm Baking Company of Chicago (hereinafter referred to as Kungsholm) for the sale of Century. Such negotiations culminated in a written offer from Kungsholm on March 26, 1946. Charles and Bruce accepted such offer on that date for themselves and for their wives as attorneys-in-fact. Both Olyve and Mary had participated in the discussions leading up to the agreement and approved of it. This sales agreement provided that the partners' capital account as of January 26, 1946, was $119,934.79; and that, in consideration for the sale of Century, Kungsholm would pay such amount, plus $405,065.21. *25 The agreement further provided: "You [Century] further agree that should this contract be consummated on or before June 26, 1946, the entire profits of the operation of the partnership from January 26, 1946 to June 26, 1946 shall belong to us except that fifty per cent (50%) of the net profits thereof less Federal Income Taxes computed at the rate of thirty-eight per cent (38%) and Indiana Gross Income Tax, shall be included as a part of the purchase price for the above described leasehold. In the event that this contract is not consummated on or before June 26, 1946, (or the extended time, in the event that the time for completing the contract is extended) all the net profits of the business resulting from the management and operations thereof shall belong to you." It was also agreed that the partners' capital account would not be less at the time the sale was consummated than on January 26. Withdrawals from the account were permitted but had to be replaced in cash or its equivalent. Kungsholm's purchase was contingent upon the approval by the Securities and Exchange Commission of its proposed stock issue and of the underwriting of such issue by Ames Emerich and Company of Chicago. *26 On January 11, 1946, Century, through Charles and Bruce, borrowed $25,000 from the American National Bank of Indianapolis, Indiana (hereinafter referred to as the Bank). One-half of the principal of such note was repaid on February 11, and the balance renewed to March 14, at which time payment in full was made. On May 10, 1946, an additional $16,254.20 was borrowed and was paid in full on June 6. Bruce advised the vice president of the Bank that he and Charles had given Kungsholm a 90-day option, running from March 26, to purchase Century and that if the purchase was made he would make every effort to see that the Bank retained the Century business. The Securities and Exchange Commission did not approve Kungsholm's stock issue. Nevertheless, its purchase of Century was consummated on June 26, 1946, by a bill of sale signed by Charles and Bruce, and by them in behalf of their wives. Kungsholm issued a check payable to the four partners on that date in the amount of $339,755.08, and gave its note, also naming all four as promisees, in the amount of $100,000, due on or before February 15, 1947. Partnership withdrawals prior to June 26, 1946, and direct payments by Kungsholm for *27 other costs incident to the sale were credited against the purchase price. The total purchase price, computed pursuant to the terms of the agreement signed on March 26, 1946, was as follows: Total price per agreement of
3/26/46
$525,000.00
Add: 1/2 of net profit 1/26/46 to
6/26/46 - less taxes
27,527.99
Total purchase price
$552,527.99
Bruce and Charles advised the president of the Bank on June 28 that Century and all its assets had been sold to Kungsholm. Kungsholm operated Century under the name of Century Biscuit Division. The first entry made on the general ledger of the books of account for such division was on July 1, 1946, and recorded the assets acquired on June 30, 1946. Kungsholm's accounting period for the Century Division ran from October 1 to September 30. The division's sales were as follows: Year
Month
Sales *
1946
July
$ 58,000
August
155,500
September
150,000
October
176,000
November
195,000
December
92,000
1947
January
25,000
February
22,000
March
30,000
April
46,000
May
8,000
June
3,200
Withdrawals by the four partners prior *28 to the sale on June 26 were credited against Kungsholm's indebtedness on its $100,000 note. They were entitled to share in future profits to reduce the balance, and received a $6,000 payment on September 24, 1946. Kungsholm was adjudged a bankrupt on June 17, 1947, and a creditor's claim was filed by Charles, Bruce, Olyve, and Mary which was allowed in the amount of $34,260.06. They subsequently received a dividend of $3,516.45 on such claim. Charles, Bruce, Olyve, and Mary reported and paid taxes on equal shares of the partnership income for the years 1943, 1944, 1945, and up to January 26, 1946. Each reported and paid taxes on his or her equal share of the long-term capital gain realized from the sale of Century in that year. On their returns for that year, they reported no income from Century from January 26 to June 26, the date of sale. In determining the deficiencies herein, the respondent concluded that Olyve and Mary were not bona fide partners for Federal tax purposes. He also considered June 26, 1946, to be the date on which Century was sold and determined that such income as was earned during the period January 26 to June 26 should have been reported by Charles and Bruce *29 on their returns for that year. Olyve and Mary were bona fide partners of Century. Partnership income during the period January 26 to June 26, 1946, was taxable income to the four partners. The $100,000 promissory note given by Kungsholm on June 26, 1946, was the note of a responsible maker and its market value was equal to its face value. Issue 1 Opinion Whether the two wives were bona fide partners in Century after July 1, 1943, is a question of fact to be determined by whether they and their husbands "in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." . The family partnership is a warning that things may not be what they seem. Because of the obvious possibilities of tax avoidance which it offers, it must be closely but fairly scrutinized. The court in the Culbertson case emphasized that that examination must be made in the light of all the facts. We think the whole record before us establishes a real intent on the part of the husbands and the wives here to conduct Century's business as a partnership after July 1, 1943. The agreement signed on *30 that date treated each partner alike. The husbands were given no preferential status over their wives. The wives, before and after the formation of the partnership, contributed vital services to the business. Their efforts in developing the recipe for the O'Henry Cookie resulted in the creation of a product which was responsible for a large share of the firm's profits. They improved existing products and helped to create new ones which further added to the success of the business. It was at their insistence that the manufacture of some one hundred or more theretofore unsuccessful types of cookies was discontinued when their husbands first began operating Century. They were primarily responsible both before and after becoming partners for maintaining the high quality standards of its products - a very real factor in the success of a food-manufacturing business. We think the inference clear from the record that their own personal estates, inherited from their fathers, were a factor of no little importance in securing the necessary loan with which Century was purchased. The wives reported their equal shares of partnership profits pursuant to that agreement, and paid income taxes *31 thereon. Each reported and paid taxes on her share of the gains from the sale to Kungsholm in 1946. They had participated in the discussions leading up to the sale and approved of the agreement which was finally reached. They were constantly consulted by their husbands on the general operation of the firm's business. They were not made partners prior to July 1, 1943, because it had been necessary to continue Century's corporate form until certain liabilities were paid. It is true that the wives did not maintain regular office hours. The nature of the services which they performed did not require that they do so. Their initial capital investment was only a division of their husbands' capital accounts. But failure to maintain regular office hours and capital investment by way of a gift does not vitiate a bona fide intent to form a valid partnership. . We think the respondent erred in allocating the wives' distributive share of partnership income and the gain from the sale of the partnership to the husbands. Issue 2 Opinion The petitioners and Olyve failed to report as income partnership earnings for the period January 26 to *32 June 26, 1946. They contend that all profits from Century's operation during those 5 months belonged to Kungsholm because of the agreement signed on March 26, 1946. The respondent determined that partnership profits for the period in question were taxable income to Charles and Bruce. The March 26 agreement provided that all profits from Century's operation from January 26 to June 26, 1946, should belong to Kungsholm. The sales price agreed to was to be increased, however, by an amount equal to one-half of the profits of such period less deductions for Federal and Indiana State taxes. The petitioners' interpretation of that provision runs afoul of a cardinal principle of Federal taxation - that income is taxable to him who earns it. . Agree they did, as indeed they may, that among the assets of a going business, to be transferred at a subsequent date, shall be the earnings during the intervening period. But such an agreement cannot shift tax liability from the one who earns the income. As we said in : "The fallacy of the petitioners' method lies in their failure to take *33 account of the fact that the partnership contracted to sell, and did sell, the earnings, which were contained in its asset accounts, for the four-month period * * *, which must have belonged to it before they could become the property of anyone else. The fact is that before the earnings became the property of the purchaser they were income to the seller, within the meaning of the law, and as such must be included in the partnership net income in respect to which the petitioners are liable for income tax according to their respective distributive shares therein." See also (C.A. 5, 1949) affirming in part our memorandum opinion [. The sale of Century was not completed until Charles and Bruce executed a bill of sale on June 26. Prior to that time, Kungsholm had no control over the operation of Century's business nor any vested rights in its assets. The agreement to purchase Century was wholly contingent on the approval of Kungsholm's stock issue by the Securities and Exchange Commission and the subsequent underwriting of that agreement by a Chicago brokerage house. The issue was not approved, and the *34 fact that Kungsholm nevertheless completed its purchase agreement did not vest it with ownership of Century's assets nor constitute it the taxable source of Century's profits during the period from January 26 to June 26. See ; (C.A. 6, 1940), certiorari denied . Issue 3 Opinion We are unable to find from this record that the $100,000 promissory note, given on June 26, 1946, by Kungsholm, in part payment of the purchase price for Century, was worthless at that time as petitioners claim. Kungsholm was a large and going concern. Its Century Division showed a substantial volume of sales for many months after the purchase. The petitioners were entitled to share in the profits after the sale to reduce further the outstanding balance, and received $6,000 from Kungsholm on September 24, 1946. The note was a substantial part of the consideration received by the partners and was properly included at its face value in computing the total gain received from the sale. ; *35 (C.A. 7, 1934). Issue 4 Findings of Fact In 1943 and subsequent years, Charles and Bruce continued to make commission sales for their former employers. They were not reimbursed for traveling expenses incurred in making such sales. In his return for the year 1943, Bruce reported income from Martin Varnish Company of $6,772.64 and traveling expenses, as follows: 26 trips - Indianapolis to Day-
ton, at $9.42
$244.92
30 days at hotels, at $4.00
120.00
68 meals, at $1.75
119.00
60 trips - taxicabs, at $0.65
39.00
1 trip - Chicago to Washing-
ton, D.C.
220.00
18 trips - Chicago to St.
Charles, Ill., 60 miles, at
$0.05 per mile by auto
54.00
2 trips - Chicago to St. Louis
145.00
Not reimbursed by Martin
Varnish Company
$941.92
Brought forward
$ 941.92
Automobile Expenses: Buick Auto - Cost
$1,395.00
Depreciation - 25%
$348.75
Gas and Oil
176.40
Insurance
46.20
Repairs, etc.
68.43
$639.78
Used 90% in business
575.80
$1,517.72
In that year, Charles reported income from Hinde & Dauche Paper Company of $3,162.76 and traveling expenses, as follows: Hinde & Dauche Paper Company
Transportation - Railroad
$275.60
Meals
125.70
Hotel and Tips
110.50
$ 511.80
Automobile Expenses: Chrysler - Cost
$1,375.00
Depreciation - 25%
$343.75
Gasoline and Oil
112.35
Insurance
52.30
Repairs
42.78
$551.18
Car used 80% in business
440.94
$ 952.74
*36 The respondent disallowed all such amounts claimed. In his returns for 1944, 1945, and 1946, Bruce claimed itemized traveling expenses incurred in behalf of Century and the Martin Varnish Company from which he received income. In his returns for the same years, Charles claimed itemized traveling expenses incurred in behalf of Century for all 3 years and other ventures from which he received income in 1946 of $5,500, as follows: Bruce
Year
1944
Depreciation on Auto, Gas, Oil,
Insurance, and Repairs (90%)
$ 551.88
Travel Expense - Martin Varnish
166.97
$ 718.85
1945
Depreciation on Auto, Gas, Oil,
etc. (90%)
530.96
Travel - Martin Varnish
350.49
$ 881.45
1946
Depreciation on Auto, Gas, Oil,
etc. (90%)
1,534.59
Travel - Martin Varnish
386.75
Travel - Other
587.00
$2,508.34
Charles
1944
Depreciation on Auto, Gas, Oil
(80%)
$ 504.44
1945
Depreciation on Auto, Gas, Oil
(80%)
482.22
1946
Depreciation on Auto,
Gas, Oil (80%)
$ 737.75
Airplane (80%)
1,528.36
$2,266.11
Traveling expenses for
Century
1,349.60
Total
$3,615.71 The respondent disallowed *37 all such claims except $386.75 of the amount claimed by Bruce in 1946. During each of these years, the respondent allowed a deduction of $7,500 from Century's partnership income as reimbursement for traveling expenses to the two men. Charles claimed traveling expenses in his return for the year 1947, incurred in earning income of $20,166.66 from two motor companies in Springfield, Ohio, and Ft, Wayne, Indiana, and a farm in Shelbyville, Indiana, as follows: Airplane - Depreciation
$ 725.00
Gas, Oil, Hotels, Meals, etc.
2,577.41
$3,302.41 The respondent disallowed the amount so claimed. Receipted hotel bills and other records of travel expenditures incurred by the two men were left in the files of Century when it was sold and were not available at the trial. The petitioners incurred traveling expenses, for which they were not reimbursed, in earning income during the years in question, as follows: Year
Bruce
Charles
1943
$941.92
$511.80
1944
166.97
0
1945
350.49
0
1946
386.75
0
1947
0
0
Opinion Under section 23 (a) (1) (A) [1] of the Code, petitioners may deduct all ordinary and necessary traveling and entertainment expenses *38 incurred in behalf of Century and other ventures from which they received income. But, as the court said in (C.A. 8, 1942): "A taxpayer always has the burden of establishing his right to any claimed deduction for income tax purposes. Where he seeks to have a deduction allowed by the Board of Tax Appeals, as an ordinary and necessary business expense, within the meaning of section 23 (a) * * *, he must furnish as definite proof as is reasonably possible, in the situation and circumstances, of the nature and details of the expenditures claimed to have been made. * * *" The *39 petitioners were unable to offer any documentary evidence to substantiate the expenditures claimed on their returns. Their testimony with respect to certain of the amounts claimed, however, convinces us that some allowance should be made by applying the rule of (C.A. 2, 1930). For the year 1943, both petitioners itemized traveling expenses incurred in earning commissions from their former employers. These seem reasonable to us in relation to the amount of income so received and should be allowed. The additional deductions for depreciation and operation of automobiles, claimed to be primarily used in their business, we do not feel are justified. Such costs might well be a duplication of expenses already allowed, or for which the petitioners may have already been reimbursed. In 1944, 1945, and 1946, Bruce continued to make occasional sales for the Martin Varnish Company and claimed a deduction for moderate traveling expenses incurred in so doing. These we think are justified. Deductions claimed in those years by Bruce and Charles for depreciation and operation of automobiles allegedly used in their business, we think are unjustified *40 for the same reason we set forth in disallowing similar claims for the year 1943. Century was allowed a deduction of $7,500 each year as reimbursement to petitioners for traveling expenses. This, we think, is sufficient in the absence of more persuasive evidence that additional amounts were spent. In 1946 and 1947, Charles claimed a deduction for depreciation and operation of an airplane. There was no showing that the plane was used in connection with any business from which Charles received income. Nor was any testimony or other evidence offered with respect to a claimed deduction of $2,577.41 allegedly spent for "Gas, Oil, Hotels, Meals, etc." in 1947. Hence, no allowance therefor nor for depreciation and operation of the airplane may be made. . Issue 5 Findings of Fact Mary was the daughter of John B. Utley, who died December 2, 1938. His heirs-at-law were his wife, Mary, and his son. Mary, in 1939, received assets having a value of more than $10,000 as part of her share of the estate. At the time of Utley's death, there was an outstanding judgment against him of $14,511.58 which was settled by court order in November 1943, *41 for $9,077.39. In settlement of her share of the judgment, Mary paid $3,025.79 in 1943 and claimed a fully deductible loss of that amount in the joint return which she and her husband filed for that year. The respondent disallowed such deduction, contending that the payment was in the nature of a capital expenditure. In her return for 1944, Mary deducted a loss of $177.21 arising from her father's estate. She reported income from the estate in 1945 and 1946. Opinion While the evidence before us frames little more than the barest outline of what transpired, we have found that Mary received more than $10,000 as her one-third share of her father's estate in 1939. An outstanding judgment against her father at the time of his death was settled in 1943. Mary paid one-third of the amount thereof and claimed a fully deductible loss therefor in her return for that year. In the absence of additional evidence, we can but observe that such payment was no more than a return of a part of her father's estate which she took originally, subject to outstanding liabilities against it. The petitioner cites , as authority for permitting *42 the payment to be deducted as a capital loss. We think the reasoning of that case supports our decision here. The facts of the two cases, however, are different as must be the result. There the taxpayer initially had a taxable capital gain from the distribution of corporate assets and subsequent payment in settlement of a judgment against the nonexistent corporation resulted in a diminution of that gain by way of a capital loss. Here the taxpayer initially received what was to her a nontaxable bequest or devise and subsequent settlement of a judgment against the deceased devisor resulted in no more than a return of a part of the bequest. Issue 6 Findings of Fact In 1946 and 1947, Bruce purchased the following shares of stock in two Mexican companies organized in 1945: Maderera del Palomo, S.A.
(hereinafter referred to as Palomo)
Date Issued
No. of Shares
Price Paid
6/29/46
6,000
$ 6,000
9/12/46
26,000
26,000
Mexamerica, S.A.
8/26/46
250
$25,000
1/28/47
10
1,000
2/ 4/47
50
5,000 Petitioner purchased such shares in the belief that Palomo held title to some 75 square miles of virgin timber land in Mexico and that a large profit could *43 be made on the American market from the sale of lumber taken therefrom. Mexamerica, he understood, would exploit a variety of mineral deposits on the same tract. In addition to purchasing shares of stock, petitioner also made loans to Palomo in 1946 and 1947 totaling $12,600. These loans were made in an effort to get the production of lumber started and to defray the expense of resolving certain legal questions with the Government of Mexico. Only a few carloads of lumber were ever shipped into the United States. In his income tax return for 1948, petitioner deducted the amount of loans made to Palomo as a "total loss", stating that: "Corporation is now insolvent and assets abandoned or disposed of." Petitioner received a letter dated February 23, 1950, from Javier Alvarez M., a Mexican attorney, whom he employed to investigate Palomo. Alvarez reported that Palomo was legally constituted but had never had title to the timber land; that the right to exploit such land had been exclusively granted by the Mexican Government to the Benavidez family, and such grant had been revoked when the Benavidezs assigned it to Palomo. Petitioner gave such information as he had about the two companies *44 and their promoters to representatives of the Securities and Exchange Commission. Petitioner claimed no deduction for the alleged worthlessness of Palomo and Mexamerica stock in his return for 1946. He now asserts such claim, however, since the respondent has determined deficiencies against him for that year. Petitioner failed to prove that the Palomo and Mexamerica stock was worthless when purchased in 1946, or that it became so in that year. Opinion Determination of the worthlessness of stock and the time when it became so is a question of fact, and the petitioner has the burden of so proving to justify a deduction therefor under section 23 (g) (2) of the , rehearing denied . This petitioner has attempted to sustain his burden by showing that Palomo and Mexamerica had no assets and that their shares had no value when purchased in 1946. Having invested in the two companies in the expectation of reaping handsome profits, had petitioner established as a fact that the shares were worthless when he bought them, he would be entitled to an appropriate deduction. , *45 certiorari denied ; . This record, however, does not contain sufficient evidence to justify such a holding. As the court observed in : "* * * The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test. "The standard for determining the year for deduction of a loss is thus a flexible, practical one, varying according to the circumstances of each case. The taxpayer's attitude and conduct are not to be ignored, but [they are not] * * * the decisive factor * * *." While we do not know, in fact, that the two companies possessed no assets nor exploitation rights when petitioner purchased his shares in 1946, even assuming that to be so, the nature of the undertaking and the expectation of large dividends therefrom might well have given those shares definite market value to a reasonable person interested in such a venture. We think petitioner was just such a person. He was a man of intelligence and successful business experience. In addition to purchasing stock, *46 he loaned money to Palomo in 1946 and 1947, even after learning that representations made to him at the time he purchased his shares were not entirely true. On the record before us, we can only say that petitioner has not proved that the shares of Palomo and Mexamerica were worthless when purchased or that they became so in 1946. Issue 7 Findings of Fact Bruce and his mother, Cora E. Hulbert, each owned a one-sixth partnership interest in the Model Creamery of Indianapolis. In 1947 they sold their combined interests to another of the partners, one Roger W. Erbe, for the sum of $40,000. Of the purchase price, $25,000 was paid in cash and promissory notes were given for the $15,000 balance. The respondent's deficiency notice determining additional liability against petitioner for 1947 was based on a report of the examining revenue agent covering the years 1946 through 1948, which indicated that Bruce and his mother had sold their partnership interests in the Creamery for $40,000; that Cora had received $15,000 cash, and Bruce $10,000; but that Erbe could not remember to whom the notes for the balance were made payable. The report further indicated that Cora E. Hulbert's interest *47 on the books at the time of sale was actually greater than Bruce's. It concluded by stating that the agent could not obtain more definite evidence, and the respondent in his deficiency notice determined that Bruce had received a taxable gain of $8,136.98 based on a sales price of $25,000 for his individual interest. Bruce sold his interest in the Creamery for $20,000. Opinion It is axiomatic that the respondent's notice of deficiency is presumed to be correct and that the petitioner has the burden of producing evidence to overcome that presumption. While this petitioner produced no substantiating evidence and the record is not clear as to the payee of the checks and the promisee of the notes, we are persuaded by his testimony that he and his mother received equal payments for their respective one-sixth partnership interest in the Creamery. Respondent based his conclusion on no more than supposition that Erbe's notes designated petitioner as sole payee, and we think his determination that petitioner's share of the proceeds of the sale were greater than his mother's was unjustified. Petitioner did not specifically assign as an error respondent's inclusion of the $15,000 face *48 amount of the notes in computing the long-term capital gain realized on the sale. His petition simply alleged the respondent made an improper and erroneous determination of that gain. On brief, however, he seems to argue that the notes were not regarded as cash, had no readily realizable market value, and, hence, their face amount should not be included in computing the gain on the sale. This is similar to the argument he advanced with reference to the $100,000 Kungsholm note. No evidence was offered to substantiate his claim that Erbe's notes were worthless or of a value less than face. Therefore, we must conclude that they did have value, were a part of the total consideration received, and their face amount should be included in computing the long-term gain. ; Decision will be entered under Rule 50. Footnotes
*. Figures rounded to nearest $100.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *.↩